IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOHN AND MARY DOE,**<br>**for themselves and their minor child,**<br>**JAMES DOE,**<br><br>**v.**<br><br>**PROVIDENCE ACADEMY, INC., and**<br>**BENJAMIN HOLLAND,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **No.: 2:25-cv-00170-DCLC-CRW**<br><br>**JURY DEMANDED** |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

---

Defendants Providence Academy, Inc. ("Providence") and Benjamin Holland ("Mr. Holland") (collectively "Defendants"), by and through counsel, hereby file this Memorandum of Law in Support of their Motion for Summary Judgment as to claims under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq.* ("Title IX") and Tennessee state tort claims contained in the Amended Complaint filed by Plaintiffs identified as John and Mary Doe, for themselves and their minor child, James Doe (the "Minor Plaintiff") ("collectively "Plaintiffs").

## FACTS AND PROCEDURAL HISTORY

Providence is a private Christian school in Washington County, Tennessee. Am. Compl. ¶ 5. Providence was formed in 1994, and since 1995 has held tax-exempt status with the Internal Revenue Service under Section 501(c)(3). Declaration of Benjamin Holland ("Holland Decl.") at ¶ 3; <u>Exhibit 1</u> to the Holland Decl., Grant of Providence Academy's status under 501(c)(3). Providence did not receive funding from the federal government until the extraordinary conditions

created by the COVID-19 pandemic and associated lock-down procedures, when it applied for and received loans through the Paycheck Protection Program ("PPP") Holland Decl. ¶¶ 4-5. Those monies were borrowed from Acclivity Financial, a subsidiary of Citizens Bank, and were used to pay Defendant's teachers and staff from April 17, 2020, through June 30, 2020, when Providence could not hold classes. *Id*. at ¶ 5-6; Exhibit 2 to the Holland Decl., Payroll Summary for Providence Academy. Providence later sought forgiveness of the PPP loans and interest, which was granted by the Small Business Administration. Holland Decl. ¶ 7-8; Exhibit 3 to the Holland Decl., Providence Academy's PPP Loan Forgiveness Application Form 3508EZ; Exhibit 4 to the Holland Decl., Notice of Loan Forgiveness from Acclivity Financial and Citizens Bank dated November 6, 2020. That period in 2020 was the only time in which Providence received any federal funds. Holland Decl. at ¶ 9. Providence has never otherwise applied for or received federal financial assistance for administration, training, or other benefits of any kind. *Id*.

In 2021 Providence applied for admission to the Tennessee Secondary School Athletic Association ("TSSAA"). Am. Compl. ¶ 120; Holland Decl. at ¶¶ 11-12; Exhibit 5 to Holland Declaration, TSSAA Application Materials of Providence Academy. The purpose of the TSSAA is to "stimulate and regulate interscholastic athletic competition among member schools in accordance with the standards established by those schools in the TSSAA Bylaws." Exhibit 6 to Holland Declaration, 2023-2024 TSSAA Handbook ("TSSAA Handbook") p. 1.

> Membership in the TSSAA is open to any secondary school in Tennessee, both public and non-public, that meets the following criteria:
>
> 1. Includes grade 9 and/or higher.
> 2. Is approved by the State Department of Education, State Department of Education approved agencies (Schools must be in Category 1, 2, or 3), AdvanceEd, and/or Southern Association of Independent Schools.

Exhibit 5 to the Holland Declaration, TSSAA New Member Request Form p.1. Providence agreed to abide by the Bylaws of the TSSAA and rules contained in the TSSAA Handbook. Holland Decl. ¶ 14. The rules and Bylaws of the TSSAA govern sanctioned sports, coaching requirements, athlete eligibility, students changing schools, recruiting, specialized camps, and similar competition requirements. TSSAA Handbook, *supra*. The Bylaws and rules of the TSSAA make no mention of Title IX or its provisions, and contain no language subjecting member schools to the requirements of Title IX. *Id*. None of the Bylaws or rules contained in the TSSAA Handbook dictate how Providence or other TSSAA-member schools operate their respective schools, so long as their sports teams follow the athletic competition rules set forth in the Bylaws. *Id*.

During the 2023-2024 school year, the minor Plaintiff James Doe was a student at Defendant's middle school. Am. Compl. ¶¶ 4. On February 11, 2024, James Doe attended a Super Bowl party at a private residence (the "Super Bowl party"). *Id*. at ¶ 12. The Super Bowl party was not a school function, it did not take place on school property, and no employee of Providence Academy was in attendance. Holland Decl. ¶ 20. On February 15, 2024, Providence Academy received a report from James Doe that he was assaulted by another minor child (identified in Case No. 2:25-cv-00033 as "L.T.") who was also a student at Providence Academy. *Id*. at ¶ 21. Immediately after receiving the report of the alleged assault, Providence Academy gathered information about what had occurred and reported the off-campus assault to the Department of Children's Services and local law enforcement, as required by law. *Id*. at ¶ 26; Tenn. Code Ann. § 49-6-1601. Providence suspended the minor L.T. pending investigation, and later determined to expel him. Holland Decl. ¶¶ 30-31.

Plaintiffs commenced this suit on February 7, 2025, asserting claims against Providence under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 *et seq*. ("Title IX"), and

various state law claims. Docket Entry No. 1. After Defendants filed a Motion to Dismiss (Docket Entry No. 24), Plaintiffs sought leave to file an Amended Complaint, which was granted on March 26, 2026. Plaintiffs thereafter filed an Amended Complaint on April 1, 2026, asserting claims under Title IX and Tennessee state law claims of negligence, negligence *per se*, intentional infliction of emotional distress, and negligent infliction of emotional distress. Amended Complaint (Am. Compl."), *infra* (Docket Entry No. 33).

**<u>SUMMARY JUDGMENT STANDARD</u>**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a motion for summary judgment, the court must consider all facts in the light most favorable to the nonmoving party and the nonmoving party should receive the benefits of every reasonable inference. *Campfield v. Safelite Grp., Inc.*, 91 F.4th 401, 410 (6th Cir. 2024).

Applying motions for summary judgment to contracts, "[i]f a contract is in writing and its terms are clear and unambiguous, we ascertain the contract's meaning in accordance with the contract's plainly expressed intent." *Trs. of the Rion Workers Defined Contribution Pension Fund v. Next Century Rebar, LLC*, 115 F.4th 480, 490 (6th Cir. 2024) (quoting *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 562 (6th Cir. 2015). If the terms of the contract could be reasonably interpreted in two different fashions, then extrinsic evidence is allowed to ascertain the true meaning of the contract. *Rion Workers*, 115 F.4th at 490. However, when the terms of the contract are clear and there is no legal question at stake, summary judgment is proper. *Avantax Wealth Mgmt. v. Marriott Hotel Servs., Inc.*, 108 F.4th 407 (6th Cir. 2024). In *Avantax*, the court evaluated whether a force majeure clause was enforceable when COVID-19 frustrated the purpose of the contract. *Id.* at 415, 416. The Court held that since the contract was unambiguous and COVID-19 restrictions would

frustrate the basis of the contract, then the lower court's granting of the motion for summary judgment should be granted. *Id.* at 420.

## LAW AND ARGUMENT

As an initial matter, Defendants freely acknowledge that the arguments contained in this Memorandum are virtually identical to those made in Defendant Providence Academy's Memorandum in Support of Second Motion for Summary Judgment in the companion case, *Torbett v. Providence Academy*, Case No. 2:25-cv-00033 (E.D. Tenn. Oct. 19, 2026). As the Court is aware, the Plaintiffs in *Torbett* explicitly copied some of the Title IX claims from the Plaintiffs in this case verbatim, and thus the Title IX claims are functionally identical. Moreover, both cases arise from the same facts and occurrences and involve the same parties and theories for the application of Title IX. A copy of the Court's Memorandum Opinion and Order in the *Torbett* matter is attached to the Motion as Exhibit B.

### A. Plaintiff's claims under Title IX fail as a matter of law.

In order to prevail in their claims under Title IX, Plaintiffs must prove sufficient facts to support a finding that Providence is subject to Title IX. In order to do so, Plaintiffs must establish facts to show that Providence was a "recipient" of federal financial assistance within the meaning of 34 C.F.R. § 106.2. *NCAA v. Smith*, 525 U.S. 459 (1999). Specifically, 34 C.F.R. § 106.2 defines "recipient" to include any entity to which "federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof." Although Title IX does not define federal financial assistance, Department of Education regulations define "federal financial assistance" for the purposes of Title IX as follows:

> Federal financial assistance means any of the following, when authorized or extended under a law administered by the Department:
>
> (1) A grant or loan of Federal financial assistance, including funds made available for:
>
> (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
>
> (ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.
>
> (2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.
>
> (3) Provision of the services of Federal personnel.
>
> (4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.
>
> (5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2.

Plaintiffs have raised four theories under which they allege Providence was a "recipient" of federal financial assistance: (1) receipt and/or forgiveness of PPP loans, (2) receipt of tax-exempt status for federal tax purposes, (3) via a voluntary commitment to comply with Title IX in applying for or receiving TSSAA membership, or (4) by ceding control of its athletic department to the TSSAA, which itself receives federal financial assistance within the meaning of Title IX. As argued more fully below, each such theory fails as a matter of law.

1. <u>Providence's receipt of PPP loans does not subject it to Title IX.</u>

The first and apparently primary basis for Plaintiffs' allegation that Providence is subject to Title IX is because it received a PPP loan during the COVID-19 pandemic. It is undisputed that Providence applied for a PPP loan in early 2020 after Governor Bill Lee signed Executive Order

17 prohibiting social gatherings of 10 or more people. Holland Decl. ¶ 4; *see* also Executive Order 17, March 22, 2020. Providence used all of the PPP funds to make payroll payments to its teachers and staff during the period from April 17, 2020, to June 30, 2020, when it unable to operate. Holland Decl. ¶ 6. Providence later applied for forgiveness of that loan, and the application was granted on or about November 7, 2020. Holland Decl. ¶ 7; Exhibit 3 to Holland Decl., Providence Academy's PPP Loan Forgiveness Application; Exhibit 4, Notice of Loan Forgiveness from Aclivity Financial and Citizens Bank dated November 7, 2020.

Whether PPP loans subject a party to Title IX has been the subject of litigation in multiple federal courts since the implementation of PPP loans in 2020 in the early days of the COVID-19 pandemic. As the District Court for the District of Nevada has noted, "Given the nature of the COVID-19 Pandemic and the urgency behind the PPP loans, it is likely that little thought was given as to whether such loans counted as 'receiving federal financial assistance.'" *Gardner v. Sage Ridge Sch.*, No. 3:24-CV-00403-CLB, 2025 U.S. Dist. LEXIS 114896, at *18 (D. Nev. June 17, 2025). The court in *Gardner* went on to provide the following background:

> PPP loans were enacted by Congress by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") during the unprecedent COVID-19 Pandemic. *See* 15 U.S.C. § 636(a)(36). The CARES Act and the PPP loans programs were enacted as "assistance and [a] health care response for individuals, families, and businesses affected by the coronavirus pandemic." Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811 (Apr. 15, 2020) (to be codified at 13 C.F.R. pt. 120). PPP loans were enacted to assist small businesses to continue operations and "keep[] workers paid and employed across the United States" during the COVID-19 crisis. *Id.* Unlike typical SBA loan programs, a PPP loan could be made to "any [small] business," non-profit organization, [*19] and other organization or business concern that qualifies as small under industry-specific rules. 15 U.S.C. § 636(a)(36)(D)(i). The SBA's guidance regarding the PPP loans notes that while the loans were eligible "for forgiveness of up to the full principal amount," the nature of the program was "temporary." 85 Fed. Reg. 20811. The loans were based on eight weeks of payroll and business costs. *Id.* Loans issued before June 5, 2020 had a maturity date of two years. *Id.* at 20813. But nowhere in the statutes or federal regulations regarding the PPP loans are there any references

> or clear conditions to abide by Titles VI or IX. *See* 15 U.S.C. § 636; 85 Fed. Reg. 20811.

*Gardner*, 2025 U.S. Dist. LEXIS 114896 at *18.

One of the first courts to examine the question of whether PPP loans or forgiveness constituted "federal financial assistance" for the purposes of Title IX was the District Court for the Eastern District of North Carolina, in *Karanik v. Cape Fear Academy*. In *Karanik*, the District Court Judge concluded that "[a] PPP loan is 'federal financial assistance' subject to Title IX because it is "[a] grant or loan of Federal financial assistance" 34 C.F.R. § 106.2(g)(1). After all, "the PPP is, in substance and in form, a loan program." *Karanik v. Cape Fear Academy*, 608 F. Supp. 3d 268, 281 (E.D.N.C. 2022) (citing *Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 423 (2nd Cir. 2022)). The court in *Karanik* went on to hold that the school in that case "had to comply with Title IX <u>for the life of its loan</u>." *Karanik*, 608 F. Supp. at 284 (emphasis added). Because the plaintiffs in *Karanik* alleged that the discriminatory behavior occurred during the loan period of the PPP loans obtained by the school in that case, the plaintiffs were allowed to proceed with their claim. Notably, that factual scenario differs from the case at bar, which involves acts occurring in February 2024, long after the loan period of the PPP loans obtained by Providence.

In its recent ruling on June 17, 2025, the U.S. District Court for the District of Nevada assessed all current case law on the interplay of Title IX and PPP loans, and its analysis is instructive. In *Gardner v. Sage Ridge School*, parents of a minor child brought suit against the defendant school asserting various causes of action, including violations of Title IX of the Education Amendments of 1972. The Court in *Gardner* evaluated those claims, and in particular, noted findings from the Middle District of Tennessee and the Third Circuit Court of Appeals in its analysis.

> Looking to other forms of federal emergency relief, regulations from the Federal Emergency Management Agency ("FEMA") specifically "effectuate the provisions of Title VI of the Civil Rights Act of 1964," 44 C.F.R. § 7.1, and "Title IX of the Education Amendments of 1972," 44 C.F.R. § 19.100. To receive FEMA funding, FEMA requires applicants to submit "assurances . . . that each education program or activity operated by the applicant or recipient and to which these Title IX regulations apply will be operated in compliance with these Title IX regulations." 44 C.F.R. § 19.115(a). Unlike FEMA disaster relief, SBA guidance does not call out to Title VI or IX. *See* 85 Fed. Reg. 20811. Thus, the Court will not read in requirements for recipients of PPP loans, absent other forms of federal funding, to comply with Title VI or IX.
>
> Additionally, per Titles VI and IX, Sage Ridge must be *receiving* federal assistance. As the Middle District of Tennessee aptly noted: "use of the word 'receiving'—the present participle of 'receive'—makes it unequivocally clear that the program or activity at issue must be receiving, or 'com[ing] into possession of,' such assistance." *Welch v. United Network for Organ Sharing*, 767 F. Supp. 3d 746, 778 (M.D. Tenn. 2025), *adhered to on reconsideration*, No. 3:24-CV-00422, 2025 U.S. Dist. LEXIS 46909, 2025 WL 824137 (M.D. Tenn. Mar. 14, 2025) (citing Receive, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/receive (last visited February 14, 2025)). As another Court found, an entity's receipt of a PPP loan constituted "'federal financial assistance' and had to comply with Title IX for the *life* of its loan." *Karanik v. Cape Fear Acad., Inc.*, 608 F. Supp. 3d 268, 284 (E.D.N.C. 2022) (emphasis added). Sage Ridge received the loan in April 2020 for expenses covering the school the following eight weeks. The Paycheck Protection Program ended on May 31, 2021. The PPP loan that Sage Ridge received matured in April of 2022 and was forgiven in its entirety. (ECF No. 26 at 5.) Sage Ridge and Gardner did not sign their employment contract until April 17, 2023 and Doe did not enroll at Sage Ridge until later in 2023. *Id.* at 7-8.)
>
> The Court finds that permitting application of Titles VI and IX under the circumstances of this case would permit application of the statutes indefinitely and in situations where agreements between the federal government and entities have concluded. The Court acknowledges the unprecedent circumstances of the COVID-19 Pandemic and the needs of thousands, if not millions, of businesses. But absent clear Congressional intent or federal regulatory authority, the Court will not read in Title VI or IX requirements many years past the issuance of the limited and emergency PPP loan that Sage Ridge received in 2020. *See Pennhurst State Sch. & Hosp.*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

*Gardner v. Sage Ridge Sch.*, No. 3:24-CV-00403-CLB, 2025 U.S. Dist. LEXIS 114896, at *18-21 (D. Nev. June 17, 2025) (emphasis added). The *Gardner* court went on to hold that the plaintiffs

in that case had not sufficiently alleged that the defendant school in that case receives federal financial assistance such that it would be subject to Title IX, and found that the plaintiffs in that case had failed to state a claim under Title IX against the defendant school. *Id.* at 21. The *Gardner* court further held that amendment under Fed. R. Civ. P. 15 would be futile "because no set of facts can be added to Plaintiffs' … Title IX claims that would constitute a valid and sufficient claim." *Id.*

Similarly, another recent case of *Davis v. Winston Preparatory School*, where the allegedly discriminatory actions took place <u>before</u> any PPP loans were sought or received, the District Court for the Southern District of New York held that Title IX did not apply to the school because the defendant school had not "received qualifying 'Federal financial assistance' — in the form of a PPP loan — <u>at a time contemporaneous with the alleged discriminatory conduct</u>." *Davis v. Winston Preparatory Sch.*, 2025 U.S. Dist. LEXIS 123630 at *38 (S.D.N.Y. Jun. 30, 2025) (emphasis added). Thus, though the court rulings of *Davis* and *Gardner* dealt with different time periods—one before PPP loans and one after PPP loans—their holdings are complimentary, and Providence submits that the Court should adopt their reasoning.

In the case at bar, Plaintiffs' allegations under Title IX are based on Providence's "receipt"—in the past tense—of PPP loans and/or forgiveness. Am. Compl. ¶ 116; Holland Decl. ¶¶ 6-7. After Defendants filed their Motion to Dismiss, Plaintiffs amended their Complaint to include a summary allegation that "Defendant Providence Academy, or some part of it, during all relevant time periods receives or continues to receive federal financial assistance." Am. Compl. ¶ 115. However, Providence has denied receiving any federal funds since 2020, and specifically denied receiving federal funds during the 2023-2024 school year at issue in this case. Holland Decl. ¶ 10. Indeed, Providence could not have received any PPP loans in 2024, as such loans were

discontinued no later than May 31, 2021. *Gardner*, 2025 U.S. Dist. LEXIS 114896, at *20. And unlike cases such as *Karanik v. Cape Fear Academy*, 608 F. Sup. 3d 268 (E.D.N.C. 2022), the events in this case did not take place during the 2020-2021 academic year, when a school such as Providence might be alleged to be "receiving" PPP loans. To use the terminology employed by the Southern District of New York, it is undisputed that Providence had not "received qualifying 'Federal financial assistance' — in the form of a PPP loan <u>— at a time contemporaneous with the alleged discriminatory conduct</u>." *Davis*, 2025 U.S. Dist. LEXIS 123630 at *38 (emphasis added). As the Middle District of Tennessee has observed, the only way for the Plaintiffs' argument on the PPP loan to have merit would require this Court to "read 'receiving' as 'received,'" which runs counter to canons of construction and the plain meaning of the statute. *Welch v. United Network for Organ Sharing*, 767 F. Supp. 3d 746, 778 (M.D. Tenn. 2025).

Finally, most recently and most relevantly, the Court's own holding in *Torbett v. Providence Academy* provides authority from this District that "Providence Academy's receipt of the PPP loans in 2020 therefore does not qualify as 'receiving Federal financial assistance' under Title IX.'" *Torbett v. Providence Academy*, 2026 U.S. Dist. LEXIS 238404 at *10 (E.D. Tenn. Oct. 19, 2026). "Plaintiffs therefore cannot rely on those loans to establish that Providence Academy was receiving federal financial assistance within the meaning of Title IX when the alleged discrimination occurred." *Id*. This Court's ruling, if not directly *res judicata*, should again be followed in this case, and the Court should again find that past receipt of PPP loans does not constitute "receiving" federal funds for the purposes of claims under Title IX.

2. <u>Defendant's tax-exempt status does not subject it to the provisions of Title IX.</u>

Perhaps aware that Providence was not a recipient of PPP loans during the relevant period of alleged discrimination, Plaintiffs added to their Amended Complaint the allegation that

Providence was a "recipient" of federal funds in the form of its tax-exempt status. Indeed, it is undisputed that Providence is a 501(c)(3) tax-exempt entity. Holland Decl. ¶ 3; Exhibit 1 to the Holland Decl. However, such arguments run contrary to long-standing case law and were recently rejected by the Courts of Appeals for the Third Circuit and Fourth Circuit, and should be rejected here.

The Supreme Court, in *NCAA v. Smith*, has clarified which educational institutions are covered by Title IX and which are not: "Entities that *receive* federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that *only benefit economically from* federal assistance are not." *NCAA v. Smith*, 525 U.S. 459, 465, 119 S. Ct. 924, 142 L. Ed. 2d 929 (1999) (emphases added).

Noting the regulations contained in 34 C.F.R. § 106.2(g), which set forth the definition of "federal financial assistance" for the purposes of Title IX, the Northern District of Illinois has noted, "[C]onspicuously absent from that laundry list is income tax exemption." *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc.*, 134 F. Supp. 2d 965, 971-72 (N.D. Ill. 2001). The District of Arizona similarly observed, "'Tax-exempt status' is not listed as a form of federal financial assistance in the Department of Education's definition and tax-exempt status is not assistance 'authorized or extended under a law administered by the Department,' as the introductory phrase of the regulatory definition requires." *Doe v. Horne*, 2023 U.S. Dist. LEXIS 240844 at *6 (D. Ariz. Dec. 11, 2023).

These holdings are consistent with long-standing Supreme Court precedent regarding tax-exempt status held by a variety of religious and private institutions. "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax

exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees 'on the public payroll.'" *Walz v. Tax Com. of New York*, 397 U.S. 664, 675, 90 S. Ct. 1409, 25 L. Ed. 2d 697 (1970). In the case at bar, Plaintiffs are essentially attempting to suggest just that—the tax-exempt status converted Defendant, a private Christian school, into an "arm[] of the state," which notion the Supreme Court has dismissed since 1970.

The most recent reported case addressing the issue of Title IX and tax-exempt schools was decided by the Court of Appeals for Fourth Circuit, which found that 501(c)(3) status did not constitute receipt of federal funds for the purposes of Title IX. In *Buettner-Hartsoe v. Baltimore Lutheran High School Association*, the plaintiff had brought suit against a private school under Title IX related to alleged sexual harassment and/or assault. *Buettner-Hartsoe v. Baltimore Lutheran High School Assoc.*, 96 F.4th 707 (4th Cir. 2024) There, as here, the defendant school was exempt from federal taxes, but denied receiving direct federal funding or federal financial assistance. The defendant school moved to dismiss, and the district court denied the motion. On appeal, the Fourth Circuit found that "the plain text of Title IX contemplates the 'transfer of funds from the federal government to an entity.'" *Id.* at 712. After surveying Supreme Court precedent construing the scope of when Federal financial assistance includes indirect assistance, the Fourth Circuit determined that the phrase "receiving Federal financial assistance" meant "taking or accepting federal financial aid, help, or support, even when that assistance is through an intermediary." *Id.* at 712-13 (citing *Grove City College v. Bell*, 465 U.S. 555, 563-70 (1984); *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986); and *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999)). The Fourth Circuit observed that "Tax exemption merely allows organizations to keep the money they otherwise would owe in income tax," and was "unconvinced" by arguments made by the plaintiff that tax exempt status was similar

to indirect grants that were at issue in *Grove City College v. Bell*, 465 U.S. 555 (1984). The Fourth Circuit went on to hold that "tax exempt status pursuant to 26 U.S.C. § 501(c)(3) does not equate to 'receiving Federal financial assistance' for purposes of Title IX," and reversed the lower court's denial of the defendant school's motion for summary judgment.

The Fourth Circuit's reasoning in *Buettner-Hartsoe* was immediately cited and followed by the District Court for the Western District of Michigan. In *Grace Chen v. Hillsdale College*, the district court relied on the "well-reasoned decision" in *Buettner-Hartsoe*, concluding "that Defendant's § 501(c)(3) status does not implicate the terms of Title IX's proposed contract with educational institutions," and dismissed the plaintiff's claims with prejudice. *Grace Chen v. Hillsdale Coll.*, 2024 U.S. Distr. LEXIS 247928, at *44-45 (D. W. Mich. Sep. 13, 2024). In so doing, the District Court in *Chen* rejected the plaintiff's argument that that court should follow the holding of *E.H. v. Valley Christian Academy*, which had found that "[t]ax exempt status confers a federal financial benefit that obligates compliance with Title IX." *E.H. v. Valley Christian Acad.*, 616 F. Supp. 3d 1040, 150 (C.D. Cal. 2022). The plaintiffs in *Chen* did not appeal "the rejection of their federal claim under Title IX, presumably because Hillsdale does not accept any funding from the federal government." *Chen v. Hillsdale Coll.*, 2025 U.S. App. LEXIS 22135 at *6 (6th Cir. 2025 Aug. 28, 2025).

Closer to home within the Sixth Circuit, in *Doe v. Currey Ingram Academy*, the Middle District of Tennessee reached a similar conclusion, that 501(c)(3) status did not constitute receipt of federal funds for the purposes of Title IX. *Doe v. Currey Ingram Acad.*, 721 F. Supp. 3d 682 (M.D. Tenn. 2024). In *Currey Ingram*, the plaintiff claimed that Currey Ingram Academy "receives federal assistance in multiple ways," and also that "Currey Ingram is a 501(c)(3) entity that is tax-exempt." The Court held that these allegations were not enough and stated the "Plaintiffs have

failed to satisfy the *Twombly*/*Iqbal* standard because they have failed to allege facts (taken as true, of course), that plausibly suggest that this element is satisfied." *Id.* at 690 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

> It is entirely clear to the Court that the Government's provision (through the Internal Revenue Service) to Defendant of tax-exempt status does not fit within the definition of Federal financial assistance. If one goes through each of the five categories [contained in 34 C.F.R. § 106.2(g)], it is readily apparent that none cover the mere provision of tax-exempt status. The first category manifestly would be the most likely, and yet it cannot reasonably be set that that tax-exempt status—which the Court will construe in Plaintiffs' favor to necessarily entail enabling the entity to keep funds that otherwise would be payable to the federal government as income tax—does not constitute a "grant or loan" of anything whatsoever.

*Id*. at 688.

Finally, most recently, the Southern District of New York's holding in *Davis v. Winston Preparatory School* also examined the question of whether tax exemption subjected a school to the requirements of Title IX. *Davis,* 2025 U.S. Dist. LEXIS 123630 at *39-40. The District Court in *Davis* held that the tax-exempt status of defendant school in that case under "Section 501(c)(3) organization is not sufficient to demonstrate that it receives 'Federal financial assistance' for purposes of Title VI, Title IX, or the Rehabilitation Act." *Id.* at 44. Notably, in so holding, the *Davis* court declined to extend the holding from a 1988 case in the Southern District of New York that had formerly held that tax exemption could qualify as federal assistance, as well as the similar ruling of the more recent *E.H. v. Valley Christian Academy* from the Central District of California that tax-exempt status constituted receipt of federal funds. *See Fulani v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988); *Valley Christian*, 616 F. Supp. 3d at 1050. The *Davis* case, which was presented with both the PPP loan argument and the 501(c)(3) status argument, is highly similar to the case at bar, and the *Davis* court rejected both arguments.

Finally, Defendants would again refer to the Court's own holding in *Torbett v. Providence Academy*, which examined the weight of case law, including from the U.S. Supreme Court that "Entities that *receive* federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX; entities that only *benefit economically* from federal assistance are not." *Torbett*, 2026 U.S. Dist. LEXIS at *8-9. ("Providence Academy's receipt of the PPP loans in 2020 therefore does not qualify as 'receiving Federal financial assistance' under Title IX.'") *citing Smith*, 525 U.S. at 468). Providence's tax-exempt status does not constitute receipt of federal funds for the purposes of Title IX.

3. <u>Plaintiffs have failed to identify any rule, Bylaw, or term of membership in the TSSAA that would subject Providence to the requirements of Title IX.</u>

Plaintiffs' specific allegations regarding the TSSAA are that "Providence Academy voluntarily agreed to comply with Federal Title IX when it applied for membership in, or alternatively, when it was granted membership in, the [TSSAA]." Am. Compl. ¶ 121. However, Plaintiff has never been able to identify any rule or bylaw from the TSSAA or from the application materials that would subject Providence to Title IX. To the contrary, as set forth in detail below, none of the application materials, Bylaws, or rules of the TSSAA require any members schools of the TSSAA to comply with the provisions of Title IX.

The TSSAA Constitution, which is included in the first five pages of the TSSAA Handbook, identifies the purpose of the TSSAA "to stimulate and regulate interscholastic athletic competition among member schools in accordance with the standards established by those schools in the TSSAA Bylaws." TSSAA Handbook p. 1, Constitution § 2. The Bylaws of the TSSAA are contained in pages 8-35 of the TSSAA Handbook. However, nowhere in the Bylaws or the Constitution of the TSSAA is there any reference to Title IX or its requirements, nor does the

TSSAA Handbook mention discrimination. Presumably, this is why Plaintiffs did not attach any TSSAA documentation as an exhibit to their Amended Complaint—it does not support their Title IX claims. But by asserting that Providence's membership in the TSSAA subjected it to the provisions of Title IX, Plaintiffs must cite to some language in some instrument or document in the record that could support that legal theory, and Plaintiffs cannot do so. As this Court found in *Torbett*, "Providence Academy's membership application with the TSSAA says nothing about whether it agreed to comply with Title IX." *Torbett*, 2026 U.S. Dist. LEXIS at *14. Accordingly, no factual dispute exists that could support Plaintiffs' Title IX claim under a theory of TSSAA membership, and that claim fails as a matter of law.

Although Plaintiffs have not clearly asserted any theory for receipt of funds by PPP from TSSAA, Providence has affirmatively denied that it received or receives any funding from the TSSAA. Rather, Providence is required to pay dues and a share of gate revenue to the TSSAA for tournaments and events organized by the TSSAA. Holland Decl. ¶ 17. Providence doesn't even receive any funding from the TSSAA if its sports teams compete in state championships. *Id.* Having received no funding from the TSSAA, Providence is not subject to Title IX by "voluntary" application or receipt of pass-through federal funds.

4. <u>Providence did not cede control of its operations to the TSSAA and thereby subject itself to the requirements of Title IX.</u>

Plaintiffs attempt to create an alternative theory of liability under Title IX and the TSSAA by asserting that:

> Defendant ceded control of its operations, including but not limited to the control of its athletic department in which the minor Plaintiff was a participant to the TSSAA. The TSSAA is a recipient of federal financial assistance within the meaning of Title IX. By ceding control of all or part of the operations to the TSSAA, including submitting to the rules and regulations by which its athletic department shall operate, Defendant is subject to Title IX for this additional reason.

Am. Compl. ¶ 123.

Plaintiffs then assert that TSSAA is a recipient of federal financial assistance within the meaning of Title IX, and allege that because the TSSAA is subject to Title IX, Providence must also be subject to Title IX due to the purported "control of its operations" exercised by the TSSAA. *Id.* This final legal theory also fails as a matter of law.

Title IX governs not only organizations that receive direct federal funds, but also organizations that "control[] and manage[]" direct funding recipients. *Horner v. Kentucky High Sch. Athletic Ass'n.*, 43 F.3d 265, 272 (6th Cir. 1994); *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th Cir. 2024). Multiple courts have held that where a school that is a recipient of federal funding "cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by Title IX regardless whether it is itself a recipient." *NCAA v. Smith*, 525 U.S. at 469-70. To hold otherwise would allow direct funding recipients to "avoid Title IX liability" by "ced[ing] control over their programs to indirect funding recipients." *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1294 (11th Cir. 2007); *Barrs v. S. Conf.*, 734 F. Supp. 2d 1229 (N.D. Ala. 2010); *Comtys. for Equity v. Mich. High Sch. Atheltic Ass'n.*, 80 F. Supp. 2d 729 (W.D. Mich. 2000).

The novel legal theory adopted by Plaintiffs is essentially the opposite of Title IX case law, and posits that a private religious institution that does not receive federal funding is nonetheless subject to the restrictions and obligations of Title IX because it allegedly cedes some control to another entity (TSSAA) which also allegedly controls separate organizations that are direct recipients of federal funding. This theory of "reverse ceding of control" runs counter to the structure and logic of Title IX, which seeks to ensure that entities subject to Title IX cannot avoid their obligations by ceding control to entities that would not otherwise be subject to Title IX. It

also runs counter to the definition of "recipient" in 34 C.F.R. § 106.2, which covers entities to which "[f]ederal financial assistance is extended directly or through another recipient," but does not mention or apply to entities that pay private funds to third parties that also receive federal funds from third parties. There is no policy rationale why a school that receives no federal funds should be subject to Title IX because its students play in sports tournaments with other schools that do receive federal funds.

Defendants have been unable to find any authority or case law to support Plaintiffs' novel legal theory of reverse ceding of control. Indeed, as the cases cited above indicate, existing case law involving alleged ceding of controlling authority is made up of cases brought against athletic associations, sports leagues, board of education, or boards of regents, and not against individual private institutions. *See, e.g., A.B. v. Haw. State Dep't of Educ.*, 386 F. Supp. 3d 1352 (Haw. 2019); *Alston v. Va. High School League, Inc.*, 144 F. Supp. 2d 526 (W.D. Va. 1999); *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965 (N.D. Ill. 2001); *Parker v. Ind. High Sch. Ath. Ass'n*, 2010 U.S. Dist. LEXIS 23409 (S.D. Ind. Mar. 11, 2010); *Kemether v. Penn. Interscholastic Ath. Ass'n*, 1999 U.S. Dist. LEXIS 17331 (E.D. Pa. Nov. 8, 1999). Those associations or boards would necessarily manage federal funds of any organization that received federal funds, but that would not be the case if the participating organization was a private organization that did not receive federal funds. The argument Plaintiffs promulgate would serve to impose all the obligations of Title IX on all private organizations unless they hermetically sealed themselves off from all interactions with other organizations or the rest of their respective communities. This misguided interpretation of Title IX application would essentially prohibit any association by private groups in the public sphere and amounts to an explicit infringement of free speech. *See, e.g., Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Adkins v. Bd. of Educ.*, 982 F.2d

952 (6th Cir. 1993); *Boshers v. Maury Co. Bd. of Educ.*, 2025 U.S. Dist. LEXIS 250940 (M.D. Tenn. Oct. 28, 2025).

Regardless of whether there is any supporting case law or authority for Plaintiff's novel legal theory, Plaintiffs cannot show that the operations of a private Christian school or its athletic department are "a federally funded program" as required by Title IX case law. *See Cmtys. for Equity v. Mich. High Sch. Ath. Ass'n*, 80 F. Supp. 2d 729, 732-33 (W.D. Mich. Jan. 21, 2000). Indeed, the undisputed facts before the Court show that Defendant's athletic program, like the rest of its school operations, was funded entirely by private and non-federal funds during the entire 2023-2024 school year. Holland Decl. ¶¶ 9-10.

Moreover, Defendant's membership in the TSSAA and its agreement to abide by TSSAA rules of sports competition do not constitute a "ceding of controlling authority." The stated mission of the TSSAA is "to serve its members by providing leadership and coordination for the administration of interscholastic athletics, which will enhance the educational experiences of students." TSSAA Handbook p. 1. The only control the TSSAA asserts is that of a "general control over all athletic contests in which member schools participate." *Id.* at p. 3. <u>The focus of the TSSAA is over the athletic contests, and not the operations of the member schools themselves</u>. With respect to the actual operations of any member school, the TSSAA does not assert control over those functions. In fact, the TSSAA Handbook makes clear that it is the principal of the member school—and not the TSSAA—that "shall exercise control over all finances, the scheduling of contests, and all other matters involved in the management of the school's athletic program." *Id.* at p. 10. Similarly, school teams are defined by the TSSAA as those "under the control and conduct <u>of the school</u>." *Id.* at p. 7 (emphasis added). Notably, none of the competition rules promulgated by the TSSAA in its Bylaws or Handbook restrict Providence's control or operations of its own

school or athletic program, so long as Providence's sports teams follow the rules of fair competition. The TSSAA does not attempt to control what Providence teaches, the morals and values Providence espouses, or the behavior Providence seeks its students to emulate. TSSAA Handbook, *infra*; Holland Decl. ¶¶ 14, 16.

Finally, Providence would note that this exact claim was evaluated and rejected by this Court in *Torbett*, when the Court held that "even assuming Providence Academy relinquished control over its athletic program, that arrangement does not establish that Providence Academy was subject to Title IX." *Torbett*, 2026 U.S. LEXIS at *15. Accordingly, the undisputed facts establish that Providence did not cede control of its operations when it joined the TSSAA, and Providence is entitled to dismissal of Plaintiffs' Title IX claims as a matter of law.

### B. The Court should decline to exercise supplemental jurisdiction over Plaintiffs' Tennessee state law claims and dismiss them without prejudice.

Plaintiffs' Title IX claims are the only federal claims in the Complaint over which the Court has original jurisdiction. The remaining claims asserted by Plaintiffs are Tennessee state law claims against both Defendants, including negligence (Counts II and III) negligence *per se* (Count III), intentional infliction of emotional distress (Counts IV and VI), and negligent infliction of emotional distress (Counts V and VII). Am. Compl. ¶¶ 113-205.

A district court "may decline to exercise supplemental jurisdiction over a claim" when "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c); *see also Brown v. Cassens Transp. Co.*, 546 F.3d 347, 363 (6th Cir. 2008) ("[A] federal court should typically decline to exercise pendent jurisdiction over a plaintiff's state-law claims after dismissing the plaintiff's federal claims.") The Sixth Circuit has advised against "needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir.

1993). "When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1254-1255 (6th Cir. 1996).

In the case at bar, all Plaintiffs and Defendants are located in Washington County, Tennessee. Am. Compl. ¶¶ 4-6. The interests of judicial economy do not favor maintaining the Tennessee state law claims in this district court. *Blakely v. U.S.*, 276 F.3d 853, 863 (6th Cir. 2002). This case was not originally removed from state court, and remand is not available. Complaint, *supra*. Accordingly, dismissal of Plaintiffs' Tennessee state law claims without prejudice is appropriate. *See, e.g.*, *Burnett v. Griffith*, 33 F.4th 907 (6th Cir. 2022); *Parker v. Robertson*, 34 F. Supp. 3d 859 (M.D. Tenn. 2014).

## CONCLUSION

For the grounds stated above, the claims asserted by the minor Plaintiff James Doe through his parents under Title IX should be dismissed with prejudice because it is undisputed that Providence was not subject to Title IX. As the Title IX claims are the only claims invoking federal jurisdiction, and there is no diversity between the parties, the remaining Tennessee state law claims should be dismissed without prejudice.

Respectfully submitted:

LEWIS THOMASON, P.C.

*/s/ Peter Robison*
Peter C. Robison, BPR #27498
1201 Demonbreun St., Suite 1000
Nashville, TN 37203
Phone: 615-259-1343
probison@lewisthomason.com

*/s/ Mikel A. Towe*
Mikel A. Towe, BPR #32404
900 South Gay Street, Suite 300
P.O. Box 2425
Knoxville, TN 37902
Phone: 865-546-4646
mtowe@lewisthomason.com

*Counsel for Defendants Providence Academy, Inc. and Benjamin Holland*

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 6th day of November, 2026 a copy of the foregoing filing will be sent to all parties via Court's ECF system.

Tricia Herzfeld
Joe P. Leniski, Jr.
Daniel P. Hull
**HERZFELD, SUETHOLZ, GASTEL, LENISKI AND WALL PLLC**
1920 Adelcia St., Suite 300
Nashville, Tennessee 37212
Email: tricia@hsglawgroup.com
joey@hsglawgroup.com
daniel@hsglawgroup.com

E. Patrick Hull
**THE HULL LAW FIRM**
201 W. Sullivan Street
Kingsport, Tennessee 37660
Sullivan Street at Shelby Street
Phone: (423) 247-6151
Email: pat@hull-firm.com

*/s/ Peter C. Robison*
Peter C. Robison